IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO.: 3:08-CV-548

| | | |
|---|---|---|
| BUILDING GRAPHICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| LENNAR CORP., | ) | |
| LENNAR CAROLINAS, LLC, and | ) | |
| DRAFTING & DESIGN, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant Drafting and Design, Inc.'s Motion for Summary Judgment (Doc. 54); Defendants Lennar Corp. and Lennar Carolinas, LLC's Motion for Summary Judgment (Doc. 55); and Plaintiff Building Graphics, Inc.'s Motion for Partial Summary Judgment (Doc. 57), all filed on November 16, 2009. Plaintiff brings this action alleging that defendants misappropriated three of its home designs that are protected under the Architectural Works Copyright Protection Act ("AWCPA"), Pub. L. No. 101–650 §§ 701–706, 104 Stat. 5089, 5133–34 (1990). After reviewing the briefs, evidentiary submissions, and relevant law, and for the reasons set forth, the Court will grant Defendants' Motions. Because Plaintiff has not made out its prima facie case of copyright infringement, there is no need to consider the affirmative defenses proffered by Defendants.

## I. FACTUAL BACKGROUND

In recounting the facts relating to counts presented in the Second Amended Complaint (Doc. 51), the Court views all reasonable inferences in the light more favorable to Building Graphics, the party opposing the entry of summary judgment. *Scott v. Harris*, 550 U.S. 372, 378

1

(2007).

Plaintiff, Building Graphics, is an architectural firm that specializes in designing residential housing plans. Building Graphics has registered for copyright protection its three housing plans pertinent to this case, developed from 1993 to 1998. The "Chadwyck" design was registered as a technical drawing on October 10, 2008, and as an architectural work on November 7, 2008, and the "Ballantrae" and "Springfield" designs, both derivative works of the Chadwyck, were registered on June 22, 2009, and July 22, 2009, respectively. (Doc. 51 at 3, 5.) Building Graphics created these designs for use by three single-family home builders: the Chadwyck for use by UDC Homes, Inc., the Ballantrae for use by Hampshire Homes, Inc., and the Springfield for use by Evans Ingraham Builders.

Defendants Lennar Corp. and Lennar Carolinas, LLC (collectively "Lennar"), themselves engaged in the business of constructing single-family residential homes, contracted with Defendant Drafting & Design, which has as its business purpose the creation or modification of architectural drawings and plans, for the preparation of drawings for several homes to be built by Lennar. Plaintiff alleges that Lennar provided Drafting & Design with copies of, or information on, the three aforementioned designs owned by Building Graphics, thereby infringing on its copyrights.

Building Graphics alleges that Lennar had several avenues by which to access the protected designs. First, Building Graphics argues that one of Lennar's employees, John Gardner, was previously employed by UDC Homes and that Mr. Gardner had access to and was otherwise familiar with the Chadwyck and other floor plans designed by Building Graphics. Second, the three plans were all accessible via the website of Building Graphics's affiliate, Living Concepts, Inc. Third, Building Graphics contends that Defendants had access to the

designs through homes offered or constructed by UDC, Hampshire Homes, and Evans Ingraham, and through sales and marketing materials circulated by these builders.

Building Graphics's allegations of infringement are as follows:

(1) The "Summerlin," a Lennar home model, has a floor plan identical or substantially similar to the Chadwyck design, and a front elevation identical or substantially similar to that of the Ballantrae design.
(2) The "Hampton," a Lennar home model, has a floor plan identical or substantially similar to the Chadwyck design, and an elevation identical or substantially similar to the Springfield design.
(3) The "Hudson," a Lennar home model, has a floor plan identical or substantially similar to the Chadwyck design, and an elevation identical or substantially similar to the Springfield design.
(4) The floor plan for the "Abbey," a Lennar home model, is identical or substantially similar to the Chadwyck design.
(5) The floor plan for the "Bluffton," a Lennar home model, is identical or substantially similar to the Chadwyck design.

Given these allegations, Building Graphics has requested money damages as well as a preliminary and permanent injunction to prevent Defendants from further violating its copyrights.

Drafting & Design maintains it neither used in its work nor had access to Building Graphics's copyrighted material. Rather, Drafting & Design contends that its work was based upon residential plans and elevations that were independently created. This set of architectural plans, known as the "Fairfax" design, were supposedly developed by the Lessard Architectural Group in the Washington, DC area.[1] The Fairfax was then provided by Mr. Gardner, while employed by Lennar, to Drafting & Design for the purpose of redrawing the plan to meet North Carolina requirements and Lennar's Charlotte specifications. By modifying the Fairfax plan,

---

[1] These plans had a "U.S. Home Corporation" title block, and Lennar had since acquired U.S. Home. (Doc. 54-2 at 6–7; Doc. 54-3 at 9.) Along with these plans, Drafting & Design claims Mr. Gardner provided sales handouts as examples of what Lennar envisioned constructing in the Charlotte market.

Drafting & Design created either the "Somerset" or "3404," which then served as the precursor to the "Sumerlin," "Hampton," "Hudson," "Abbey," and "Bluffton." (*Compare* Doc. 59-6 at 19 *with* Doc. 59-6 at 40.)

Building Graphics rebuts Defendants' claim of independent creation by noting the time line of the Somerset's development. The earliest Drafting & Design invoices for work done in connection with the challenged plans were billed to Don Galloway Homes, a Charlotte-based homebuilder that was acquired by Lennar on December 21, 2001. (Doc. 54-6 at 3.) It was by means of this acquisition that Mr. Gardner, a former Don Galloway employee, became an employee of Lennar. (Doc. 59-7 at 19.) However, Drafting & Design began working on the challenged plans on or around May 16, 2001. (Doc. 59-8 at 2.) There is no evidence to suggest that, pre-acquisition, Don Galloway had access to Lennar's U.S. Home materials. Defendants have offered no explanation as to the means by which Drafting & Design begain work on the challenged plans before John Gardner became a Lennar employee. Furthermore, Defendants have done little to show that the Fairfax was itself created independently of Plaintiff's protected designs. Therefore, because this Order pertains to motions for summary judgment, the Court finds that Defendants have not demonstrated independent creation, and so cannot rebut Plaintiff's prima facie case, by means of the Fairfax.[2] The Court thus proceeds to determine whether Plaintiff has successfully made out its prima facie case, thereby raising a genuine issue

---

[2] Lennar argues that a finding that it did not deliver the Fairfax to Drafting & Design renders its status as party inappropriate. (Doc. 63 at 3.) Without details of the Lennar–Don Galloway Homes acquisition, the Court cannot presume Lennar free of the liabilities of Don Galloway, which was listed as Drafting & Design's client for the 3404 design. (Doc. 59-8 at 2.) Regardless, where a defendant's work is based upon work furnished by another, "the defendant's ignorance that such third party has wrongfully copied from plaintiff will not create any immunity." 4 Melville B Nimmer and David Nimmer, *Nimmer on Copyright* § 13.08 (Matthew Bender, Rev. Ed.) (hereinafter "*Nimmer on Copyright*").

of fact that Defendants have infringed upon Plaintiff's valid copyrights.

## II. SUMMARY JUDGMENT STANDARD

A court must grant summary judgment upon finding, based on the pleadings, discovery

and disclosure materials, and affidavits, that "there is no genuine dispute as to any material fact

and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The initial burden to demonstrate the absence of a

genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986). In evaluating whether this burden has been met, a court must construe all evidence

in the light most favorable to the nonmoving party, resolving all ambiguities and inferences in

the nonmovant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). If the movant makes a prima facie showing that there are no genuine issues of material

fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing

that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Ultimately, the Court is left to

decide "whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Speaking to the matter of summary judgment in the copyright context specifically, the

Eleventh Circuit has noted that

> [s]ummary judgment historically has been withheld in copyright cases because courts
> have been reluctant to make subjective determinations regarding the similarity between
> two works. However, non-infringement may be determined as a matter of law on a
> motion for summary judgment, either because the similarity between two works concerns
> only non-copyrightable elements of the plaintiff's work, or because no reasonable jury,
> properly instructed, could find that the two works are substantially similar.

*Herzog v. Castle Rock Entm't, Inc.*, 193 F.3d 1241, 1247 (11th Cir. 1999) (internal citations

omitted). Summary judgment is particularly appropriate where the allegedly infringing work is

merely a compilation of common design ideas, *Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919–20 (11th Cir. 2008), as the nature of a compilation narrows the substantial similarity inquiry, *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enter., Inc.*, 945 F.2d 509, 514 (2d Cir. 1991). Furthermore, in the case of architectural plans, "modest dissimilarities are more significant than they may be in other types of art works." *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992). Ultimately, if the record viewed as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587.

## III. ANALYSIS

In their motion for summary judgment and supporting memorandum, Defendants contend that Building Graphics does not own valid copyrights in the "Chadwyck," "Ballantrae," and "Springfield" designs, and that Defendants did not copy any original or protectable aspect of these designs.

### A. Ownership of the Copyright Interests

To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or protectable aspects of the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 361 (1991). The burden of showing "ownership of a valid copyright" is somewhat lightened by statutory law; a certificate of registration issued within five years of the work's publication constitutes prima facie evidence of copyright validity. *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763 (2d Cir. 1991). *But see Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010) (noting that the Copyright Office's practice of summarily issuing registrations counsels against placing too much weight on registrations as proof of a valid copyright). Even if

issued outside the five-year window, a certificate of registration has still been treated by some courts as prima facie evidence of validity. 17 U.S.C. § 410(c); *see, e.g., Telerate Sys., Inc.*, 689 F. Supp. 221, 227 n.7 (S.D.N.Y. 1988). Nonetheless, the plaintiff maintains the burden of persuasion. Fed. R. Evid. 301; *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065–66 (4th Cir. 1988). To satisfy this burden and establish ownership, the plaintiff must prove originality, copyrightability, and compliance with applicable statutory formalities. *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 387 (5th Cir. 1984).

An "architectural work," defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings," 17 U.S.C. § 101, is subject to copyright protection under the AWCPA if "original"—that is, if the author has independently created the work and the work reflects a minimal degree of creativity, *Feist Publ'ns*, 499 U.S. at 345, 351. The protected work "includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101; *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). Though left undefined in the AWCPA, "standard features" has been interpreted to mean features dictated by purely functional requirements, and the legislative history specifies "common windows, doors, and other stable building components." H.R. Rep. No. 101-735 (1990). The courts have further concluded that *scènes à faire*—generally defined as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic"—are a type of standard feature left unprotected by copyright. *Atari, Inc. v. N. Am. Phillips Consumer Elecs.*

*Corp.*, 672 F.2d 607, 616 (7th Cir. 1982) (internal citations omitted). However, if a house design is sufficiently original, copyright protection is not precluded merely because utilitarian ends are met; architectural works are by definition at least partly designed to serve a "useful function." *See T-Peg, Inc. v. Vt. Timber Works, Inc.*, 459 F.3d 97, 110 (1st Cir. 2006) (noting that the "separability test"—requiring that the protectable elements of a pictorial, graphic, or sculptural work be separate from the "utilitarian aspects"—does not apply to architectural works).

Furthermore, although the unoriginal components of a work are not subject to copyright protection, the independent selection and arrangement of these parts may be original and therefore copyrightable—as is the case with compilations. *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 438 (4th Cir. 1986) (quoting *Apple Barrel*, 730 F.2d at 387–88). According to the legislative history of the AWCPA,

> [t]he phrase "arrangement and composition of spaces and elements" recognizes that: (1) creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole; (2) an architect may incorporate new, protectible design elements into otherwise standard, unprotectible building features; and (3) interior architecture may be protected.

H.R. Rep. No. 101-375 (1990).

With these rules in mind, the Court addresses Plaintiff's ownership of the Chadwyck plan and its derivative works as valid copyrights. Here, the Copyright Office issued certificates of registration for the Chadwyck design over fifteen years after publication and for the derivative designs over ten years after they were published. However, it is within the Court's discretion to determine the evidentiary weight to be afforded a registration certificate dated more than five years after the first date of publication. *See* 17 U.S.C. § 410(c). Under the Copyright Act of 1909, in effect until 1978, a registration certificate was prima facie evidence of a copyright, regardless of the date of first publication. *See* 3 *Nimmer on Copyright* § 12.11[A][1]. The 1976

Act added the five-year requirement because "the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate." H.R. Rep. No. 94-1476 (1976). There is no reason to doubt the reliability of the facts stated in the certificates here, and so the Court gives the certificates the weight of prima facie evidence of valid copyrights.

Furthermore, while originality is an indispensable prerequisite to copyrightability, the term "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publ'ns*, 499 U.S. at 345 (citing 1 *Nimmer on Copyright* § 2.01[A], [B]). As a practical matter, because the degree of creativity required is so low, the originality requirement amounts to "little more than a prohibition of actual copying." *M. Kramer Mfg.*, 783 F.2d at 438 (citing *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–03 (2d Cir. 1951); *see also Yankee Candle Co. v. New England Candle Co.*, 14 F. Supp. 2d 154, 158 (D. Mass. 1998) ("Courts have routinely protected modern architectural structures, such as commercial homes, that possess the minimal amount of originality that copyright law requires, as well as the plans from which owners built them."). In line with these principles, the Court finds there is a genuine issue as to the originality in the arrangement of design elements in each of Plaintiff's three design plans.

However, while Plaintiff has valid copyrights, copyright protection will extend only to those elements of a work that are original to the creator. *Feist Publ'ns*, 499 U.S. at 348. For instance, as noted above, copyright protection may extend to a compilation but not to the material of which it is composed. The scope of Plaintiff's copyright ownership and the extent to which it has been infringed will thus be discussed as a part of the "substantial similarity" inquiry, in section B.2, *infra*.

B.   Copyright Infringement

Beyond proving "ownership of a valid copyright," Plaintiff must also demonstrate that Defendants copied original or protectable aspects of the copyrighted works. In doing so, "[t]he plaintiff must show not only that the defendant actually copied the plaintiff's work, but also that the defendant's work is 'substantially similar' to the protectable elements of the plaintiff's work." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002). This step is intended to be a legal inquiry, pursuant to which the courts "filter out the unoriginal, unprotectable elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity—through a variety of analyses." *Kohus v. Mariol*, 328 F.3d 848, 855 (6th Cir. 2003) (citing *Feist Publ'ns*, 499 U.S. at 345).

Since direct evidence of copying is rarely available, a plaintiff may establish an inference of copying by showing both access to the allegedly infringed work by the defendant and a substantial similarity between the two works at issue. *Keeler Brass*, 862 F.2d at 1065. The substantial similarity determination requires comparison not only of the works' individual elements in isolation, but also their "overall look and feel." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 265 (2d Cir. 2001).

1.   There Was No Legally Adequate Access

Plaintiff argues Drafting & Design had access to the "Chadwyck," "Ballantrae," "Springfield" designs in light of the following: (1) coupled with evidence that Defendants worked together on the challenged plans, testimony that, before entering a new geographic market, Lennar would conduct due diligence to assess market demand and to identify those market segments to which potential competitors were actively catering in light of competitors' renderings; (2) evidence that Plaintiff's plans had been published on the Internet; (3) evidence

that Mr. Gardner had worked for a company that at one time had access to Plaintiff's plans; and (4) evidence that sales materials were prepared and distributed by UDC Homes.

To prove access, Plaintiff must show that Defendants had an opportunity to view or copy its work. 4 *Nimmer on Copyright* § 13.02[A]. The mere possibility of such an opportunity will not suffice; "it must be reasonably possible that the paths of the infringer and the infringed work crossed." *Towler v. Sayles*, 76 F.3d 579, 582 (4th Cir. 1996) (citing *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 942 (8th Cir. 1992)). While a court may infer access if the author sent the copyrighted work to a third-party intermediary with which a defendant had a close relationship, the dealings between the intermediary and the alleged copier must have involved some overlap in subject matter and must be more than merely speculative. *See id.* at 583 (citing *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1355, 1358 (C.D. Cal. 1984) (stating that a "tortious chain of hypothetical transmittals" is insufficient to infer access)).

If clear circumstantial evidence of access is lacking, courts will generally allow the jury to infer access when the works are so strikingly similar as to preclude the possibility of independent creation. 4 *Nimmer on Copyright* § 13.02[B] (noting that access need not always be proven "when the similarity between plaintiff's and defendant's works is sufficiently striking such that the trier of fact may be permitted to infer copying on that basis alone"). However, in the architectural field, where "modest dissimilarities are more significant than they may be in other types of art works," such striking similarity will be exceptionally difficult to establish. *Howard*, 974 F.2d at 1276. Furthermore, while the Fourth Circuit—in line with the majority of circuits that have ruled on the issue—allows a showing of striking similarity to partially compensate for a deficiency in proof of access, it has not dispensed outright with the access requirement upon such a showing. *See Bouchat v. Balt. Ravens, Inc.*, 241 F.3d 350, 355–56 (4th

Cir. 2001) (stating that while "striking similarity is one way to demonstrate access, . . . [a]ccess remains an indispensable part of the copyright infringement claim"); *see also Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988) (stating that a showing of substantial similarity permits the jury to infer access in light of all the evidence); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1170 (7th Cir. 1997) (treating a substantial similarity as evidence of access). Accordingly, as discussed below, Plaintiff has failed to make a reasonable showing of access.

    *(a) Plaintiff cannot establish access based on Lennar's due diligence.*

        Plaintiff first argues that Defendants had access to its copyrighted works in light of Lennar's due diligence in entering the Charlotte market. Given this due diligence effort as well as the testimony of Lennar's Rule 30(b)(6) corporate designee establishing Lennar's uncertainty as to whether its due diligence included an evaluation of homes designed by Plaintiff or offered by Plaintiff's clients, Plaintiff asks this Court to infer a "reasonable possibility" that Lennar crossed paths with Plaintiff's protected works. (Doc. 59 at 14.)

        To support this access claim, Plaintiff cites *Bonner v. Dawson*, No. 502-00065, 2003 WL 22432941 (W.D. Va. Oct. 14, 2003). The matter of access in *Bonner*, an inapposite case, was clearly established as the plaintiff directly provided its copyright-protected work to defendant on a previous occasion. There, the plaintiff-architect drafted a customized design for American Woodmark Corp., which then entered into a lease agreement with defendant-landowner. Defendant-landowner then hired defendant-contractor to perform the construction work using the plaintiff's design. Pleased with the results, Woodmark wanted a second building constructed, based heavily on plaintiff-architect's plans but with some modifications, and again contacted defendants to handle site selection and construction but failed to contact plaintiff-architect. The second building's construction entailed the unauthorized use of plaintiff-architect's protected

design. As the engineers who prepared the modified design for the second building admittedly relied on the plaintiff's original design, access was indisputable. *Id.* at \*5. In contrast, the instant case does not involve similarly clear and direct evidence of access.

The Fourth Circuit, however, has spoken on point. In *Ale House Management, Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000), it was decided that the mere fact of a designer's doing business within the same geographic area in which information concerning the plaintiff's protected designs is available is not itself sufficient to establish a genuine issue of material fact with respect to access. Affirming the lower court's dismissal of the plaintiff-architect's copyright infringement claim, the Fourth Circuit wrote:

> AHM alleges that Raleigh Ale House's architect had access to its plans because AHM was required to submit copies of them to various building departments in the same county in which Raleigh Ale House's architect conducted his business. But AHM presents no other evidence of access. Against this "mere possibility," Raleigh Ale House's architect has affirmatively denied having ever seen AHM's drawings.

*Id.* Similarly, that Lennar's due diligence inquiry could have exposed Lennar to Plaintiff's designs—along with the designs forming the basis for every other home in Mecklenburg County—establishes only the "mere possibility" of access. Lennar's evaluation of the local market is simply not sufficient to invoke the inference of access. The Court will not infer a reasonable probability of access to specific, copyright-protected elements within a data set to which a party has been exposed without regard to the size of the data set and the number of pertinent elements. Here, the data set—namely, the number of residential-home designs in Mecklenburg County—is substantial, and the odds that Lennar came across a home based on one of Plaintiff's designs are especially attenuated in light of Plaintiff's deposition testimony. Plaintiff was able to point to only one home constructed per the Ballantra plan, one home per the Springfield plan, and no home per the Chadwyck plan. Thus, while there is some chance that

13

Lennar came across a home designed by Plaintiff, it is not a "reasonable possibility."

    *(b) Plaintiff cannot establish access based on mere Internet publication.*

        Plaintiff next argues there is at least a genuine issue of material fact regarding access because the Ballantrae and Springfield designs have been available on the Internet since their respective creation dates. However, Plaintiff has presented no evidence that Drafting & Design, or any of its collaborators, accessed these designs online.

        Public dissemination of a work "merely creates the 'possibility' of access," and courts have consistently held that the fact that a defendant "could have" or "might have" engaged in alleged conduct, without any substantive evidence, amounts to "mere speculation" and is insufficient to establish access. *See, e.g.*, *Bell v. E. Davis Int'l, Inc.*, 197 F. Supp. 2d 449, 461–62 (W.D.N.C. 2002) (J. Thornburg). Without evidence that Defendants actually visited the website on which Plaintiff's designs were posted, there is no reasonable possibility of access. *See Chafir v. Carey*, No. 06-3016, 2007 WL 2702211, at *3 (S.D.N.Y. Sept. 17, 2007) (citing *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F. Supp. 2d 514, 521–22 (S.D.N.Y. 2005)) (finding that the availability of a copyrighted work on a website does not constitute access where the alleged infringer has not been shown to have visited that website); *cf. FTD, Inc. v. Originals Florist & Gifts, Inc.*, No. 00-4458, 2000 WL 1693980 (N.D. Ill. Nov. 9, 2000) (finding the defendant had access to plaintiff's copyrighted work not only because of its availability on a publicly accessible website, but also because the defendant was a former licensee of the plaintiff). Again, without more, the Court will not infer merely from the availability of a sizable body of information—in this case, the whole of the Internet—a reasonable probability of access to the specific, copyrighted work embedded within.

    *(c) Plaintiff cannot establish access via publicly disseminated cut sheets.*

Plaintiff further argues that copies of the Chadwyck design were distributed to the public by UDC Homes through "cut sheets" or sales handouts. (Doc. 56-6 at 8.) Presuming this to be true, even though Plaintiff could not proffer any evidence that a Chadwyck home was ever built, evidence of "small circulation" without other proof of access is generally not enough to demonstrate a reasonable probability of access. 4 *Nimmer on Copyright* § 13.02[A].

As a point of reference to the instant case, in *Cholvin v. B. & F. Music Co.*, 253 F.2d 102 (7th Cir. 1958), the plaintiffs' work had been distributed in 2000 professional copies of sheet music and four recordings, of which 200,000 records were sold, and it had been performed on several nationwide broadcasts. This circumstantial evidence enabled a reasonable inference, in combination with similarities between the two pieces, that there had been infringement. On the other hand, in *Jewel Music Publishing Co. v. Leo Feist, Inc.*, 62 F. Supp. 596, 598 (S.D.N.Y. 1945), about 10,000 copies of the complaining song had been distributed or sold, and the music had also been broadcast on national performances. The court still concluded that the showing of access was insufficient, in combination with the other evidence, to support a reasonable inference of access.

Here, there is no information as to how many cut sheets were distributed. However, UDC Homes, which advertised the Chadwyck and created the cut sheets, ceased doing business in the Charlotte market in the mid-1990s, well before Defendants began developing the allegedly infringing works in 2004. In combination with the dearth of evidence that any Chadwyck home was actually constructed, this low likelihood of wide distribution of Chadwyck cut sheets does not approach even the sort of distribution at issue in *Jewel Music*. In light of these facts, it is not necessary for the Court to determine the number of copies which must be publicly distributed to raise a reasonable inference of access. The availability of Chadwyck cut sheets, as shown by the

evidence, was virtually de minimis. Therefore, these cut sheets create no reasonable probability of access.

*(d) Plaintiff cannot establish access simply in light of Mr. Gardner's employment history.*

Gardner was employed by UDC Homes between 1987 and 1989, well before the Chadwyck's development in 1993. (Doc. 3 at 22.) Here, there is no evidence of employee overlap during the relevant time period. *Contra Kamar Int'l, Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981) (finding proof of access where Plaintiff and Defendant had simultaneous business dealings with a third party). Mr. Gardner's past employment with UDC Homes is simply not sufficiently probative of the sort of corporate relationship that gives rise to an inference of access.

Frank Snodgrass of Building Graphics, Inc., revealed in his deposition that "[a]nybody could walk in UDC Homes and grab a cut sheet. I could do it. You could do it." (Doc. 56-6 at 9.) This possibility is a legally inadequate basis for establishing access and precisely the sort of "tortious chain of hypothetical transmittals" that has been deemed insufficient to infer access. As the Defendants have noted, Plaintiff is convinced Defendants must have had access because of the perceived similarities between the plans. (Doc. 54-1 at 6–7; *see also* Doc. 56-6 at 9.) As stated above, however, while courts will generally allow the jury to infer access when the works are so strikingly similar as to preclude the possibility of independent creation, the requisite "striking similarity" will be exceptionally difficult to establish in the architectural context, and Plaintiff fails to establish such similarity in this case. The extent of the similarity between Plaintiffs' and Defendants' plans is discussed in section B.2, *infra*.

*(e) Therefore, Plaintiff's arguments do not create a genuine issue of material fact with respect to access.*

Plaintiff's arguments discussed above, considered individually and in combination, do not establish a genuine issue for trial as no evidence sufficient to permit the fact finder reasonably to find for Plaintiff has been proffered. *See Tisi v. Patrick*, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000) ("The plaintiff has the burden of presenting 'significant, affirmative and probative' evidence to support a claim of access.").

2. There Was Neither Striking nor Substantial Similarity

Had Plaintiff established access, the Court would next turn to the issue of substantial similarity. The test, formulated by Judge Learned Hand, is whether an "ordinary observer" comparing two works, "unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Universal Furniture*, 618 F.3d at 436 (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)). However, the access and substantial similarity inquiries join as one in the "strikingly similar" doctrine. If a sufficiently striking similarity is found between two works, an inference of copying may be drawn without any additional evidence of access. Therefore, the Court continues with its analysis, first determining whether the similarities between Plaintiff's and Defendants' works could be considered "substantial."

It is well established that "originality is a constitutionally mandated prerequisite for copyright protection." *Feist Publ'ns*, 499 U.S. at 351. Accordingly, the substantial similarity analysis of a copyright infringement claim is divided into two steps: "the first step requires identifying which aspects of the artist's work, if any, are protectible by copyright; the second involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work." *Kohus*, 328 F.3d at 855 (internal quotations omitted). After excluding unprotectable elements and *scènes à faire*, the courts determine "whether the

allegedly infringing work is 'substantially similar' to protectible elements of the artist's work."

*Sturdza*, 281 F.3d at 1296. However, as the D.C. Circuit has noted, the "filtering out" of

unprotectable elements generally has no practical effect, for although the use per se of features

deemed "ideas" or "*scènes à faire*" is not protectable, the expression of these "ideas" is

protectable. That is, regardless of whether a design's particular features are unprotectable, the

court must further determine whether the purported infringer's expression or expressive

combination of those features and ideas is substantially similar to that of the plaintiff, thereby

violating the plaintiff's copyright.

Defendants Lennar here suggest that architectural works that incorporate a modicum of

creativity, such as Plaintiff's three home designs, are compilations to be entitled to only "thin"

protection under copyright law. (Doc. 56 at 2, 10) (citing *Intervest Constr.*, 554 F.3d at 919).

Indeed, several courts have noted that "architectural works are similar to 'compilations' under

the statute." *Home Design Servs., Inc. v. Starwood Constr., Inc.*, No. 09-02503, 2011 WL

2714109, at *5 (D. Colo. July 13, 2011); *see also Harvester, Inc. v. Rule Joy Trammell + Rubio,

LLC*, 716 F. Supp. 2d 428, 438 (E.D. Va. 2010) (citing *Intervest Constr.*, 554 F.3d at 919).

Plaintiff encourages this Court to "inquire into the total concept and feel of the works," thereby

de-emphasizing the protectability of particular features and instead stressing the uniquely

creative expression of various standard elements within each design plan.[3] Furthermore, the

Court has had difficulty identifying copyright-protectable expressions of particular features, as

opposed to the larger expressive combination of features. *See, e.g.*, *Ale House*, 205 F.3d at 143

---

[3] Evidence of this de-emphasis may also be found in Plaintiff's removal of the multiple lists within its original Complaint identifying the "several unique aspects" to each floor plan. (*Compare* Doc. 1 *with* Doc. 51.)

(finding that the concept of using an island to separate a seating area in architectural drawings "is nothing more than a concept, as distinct from an original form of expression, and is not copyrightable"). Architecture, like most art, borrows freely from its past. Accordingly, this Court will conduct a "compilation" analysis.

The Eleventh Circuit's *Intervest Construction* opinion has been met with some criticism, both with respect to its compilation analysis, *see, e.g.*, *Frank Betz Assocs., Inc. v. J.O. Clark Constr., LLC*, No. 3:08-159, 2010 WL 4628203 (M.D. Tenn. Nov. 5, 2010), and its willingness to have the substantial-similarity inquiry resolved by a judge on summary judgment, *see, e.g.*, Stephen D. Milbrath, *The 11th Circuit's New Copyright Standard for Architectural Works*, 83-Nov. Fl. Bar J. 49 (2009). Nonetheless, "if substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with 'thin' works." *Transwestern Publ'g Co. v. Multimedia Mktg. Assocs.*, 133 F.3d 773, 776 (10th Cir. 1998) (quoting 4 *Nimmer on Copyright* § 13.03[A]). Considered "thin" works, Plaintiff's compilations here are sufficiently dissimilar from Defendant's plans to preclude a finding of infringement; a court can find designs to be visually similar with the same general layout and nonetheless find the dissimilarities significant enough to preclude a finding of infringement. *Intervest Constr.*, 554 F.3d at 921.

Courts have recognized that a list of similarities alone is "inherently subjective and unreliable." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 460 (11th Cir. 1994). Accordingly, differences, including qualities such as room size, deviations in design, variant wall placements and angles, closet and entrance locations, and elevations, are carefully considered by the Court. *See id.*; *Intervest Constr.*, 554 F.3d at 916–18; *see also Ale House*, 205 F.3d at 143 ("But in comparing two plans, the size and proportion of the seating areas are dissimilar, as is the

19

placement of the pool tables.").

Here, examining as an ordinary observer, this Court notes a number of differences between the Lennar and the Chadwyck. These differences include variation in the footprint (or outline) and square footage; room dimensions (for instance, none of the Summerlin's rooms were the same size as those detailed in the Chadwyck plan); the arrangement of windows in the dining rooms, living rooms, and family rooms; the orientation of the rear wall between the kitchen and breakfast room; the placement of an island in the kitchen; the positioning of entries to the den; the orientation of the first-floor powder room; the placement of the laundry room (with respect to orientation, shape, and entry); the size of the garage and its location of entry; the placement of the pantry; the placement of a fireplace; and the size of the foyer and access to the hallway.

Another list of differences exists with respect to the two elevations that Lennar is accused of infringing. With respect to the Springfield and Lennar's models, these differences include the roof lines; the Springfield's brick construction on the sides and rear (in contrast with the Hampton's lack thereof); the design and number of windows; the gables (and placement of "eyebrows"); and the trimming of the front door. With respect to the Plaintiff's Ballantrae design and Lennar's Summerlin design, the roof lines are different—the Summerlin has a hip roof where the Ballantrae has a gable roof; the Summerlin has three windows across the garage with shutters, whereas the Ballantrae has only two windows crowned by arches; the front side of the Summerlin is constructed with stone and has a pediment over the gable, whereas the Ballantrae has brick construction; and the details within the arched gables on each house are different.

The elements of the elevations in this case, for both Lennar and Building Graphics, are composed of standard architectural elements in which neither has a copyrightable interest (for

20

instance, arched or shuttered windows). As to the copyright-protected expression in the arrangement of such elements, a layperson who "undertakes a careful comparative analysis of the selection, coordination, and arrangement of common components and elements" would not find the allegedly infringing designs substantially similar to Plaintiff's designs. *Intervest*, 554 F.3d at 916. The similarities that do exist among the plans can be attributed to the fact that "the variety of ways a two-story rectangle can be divided into three bedrooms, two baths, a kitchen, a great room or living room, closets, porches, etc., is finite." *Howard*, 974 F.2d at 1276. Therefore, no reasonable, properly instructed jury could find the works substantially similar, and the Court finds that Plaintiff has failed to meet its burden with respect to the issue of substantial similarity.

Because there is no substantial similarity, a finding of "striking similarity" is precluded, and Plaintiff cannot overcome its failure to demonstrate a genuine issue of fact with respect to access.

## IV. CONCLUSION

Although Plaintiff has demonstrated itself the owner of valid copyrights, Plaintiff has not been able to demonstrate a genuine issue with respect to Defendants' alleged copying of protectable elements of the covered works. **IT IS, THEREFORE, ORDERED** that the Defendant Drafting and Design, Inc.'s Motion for Summary Judgment (Doc. 54) be **GRANTED**, that Defendants Lennar Corp. and Lennar Carolinas, LLC's Motion for Summary Judgment (Doc. 55) be **GRANTED** in part, and that Plaintiff's Motion for Partial Summary Judgment (Doc. 57) be **DENIED** as moot.

Signed: September 30, 2011

Richard L. Voorhees
United States District Judge